**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

SUSAN CRANDALL,

                                        CASE NO. 2:18-cv-12323
        *Plaintiff*,                    DISTRICT JUDGE TERRENCE G. BERG
                                        MAGISTRATE JUDGE PATRICIA T. MORRIS
*v.*

COMMISSIONER OF SOCIAL SECURITY,

        *Defendant*.
_____/

**REPORT AND RECOMMENDATION
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT (R. 10, 11)**

## I.  RECOMMENDATION

    In light of the entire record in this case, **IT IS RECOMMENDED** that Plaintiff's

Motion for Summary Judgment, (R. 10), be **GRANTED**, the Commissioner's Motion for

Summary Judgment, (R. 11), be **DENIED**, and this case be **REVERSED AND**

**REMANDED** under sentence four of 42 U.S.C. § 405(g) for further proceedings consistent

with this report.

## II. REPORT

### A.  Introduction and Procedural History

    This is an action for judicial review of a final decision by the Commissioner of

Social Security denying Plaintiff Susan Crandall's claim for Supplemental Security Income

1

(SSI) under Title XVI, 42 U.S.C. §§ 1381-1383f.[1] (R. 1). Pursuant to 28 U.S.C. §
636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred
to the undersigned Magistrate Judge. (R. 3). Currently before the Court are Plaintiff's and
Defendant's cross-motions for summary judgment (R. 10, 11). Plaintiff has also filed a
reply, (R. 12), and Defendant filed a supplemental memorandum with the court's
permission, (R. 14).

Plaintiff filed her application for SSI on September 11, 2015, alleging onset on June
1, 2003. (R. 8 at PageID.221-229). Her claim was denied at the initial level on May 17,
2016. (*Id.* at PageID.126). After an administrative hearing was held at Plaintiff's request,
(*id.* at PageID.67-87), Administrative Law Judge (ALJ) Terry Michael Banks issued a
decision finding that Plaintiff had not been under a disability from her amended alleged
onset date of March 12, 2017, through the date of the decision, February 16, 2018. (*Id.* at
PageID.48-66). The Appeals Council denied Plaintiff's request for review. (*Id.* at
PageID.36-42). This action followed. (R. 1).

### B.  Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative
decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to
determining whether the "Commissioner has failed to apply the correct legal standard or
has made findings of fact unsupported by substantial evidence in the record." *Sullivan v.*

---

[1] Although Plaintiff originally applied for both SSI and Disability Insurance Benefits (DIB), (R. 8 at
PageID.217-229), she withdrew her claim for DIB when she amended her alleged onset date to March 12,
2017, *after* her date last insured of June 30, 2008, (R. 8 at PageID.245; R. 10 at PageID.583). Thus, only
her SSI claim is before the court.

*Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).

The court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id*.

### C. Framework for Disability Determinations

Under the Act, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).   The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

(i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled. . . .

(ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled. . . .

(iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled. . . .

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled. . . .

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that [he or] she is precluded from performing her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). A claimant must establish a medically determinable physical or mental impairment (expected to last at least twelve months or result in death) that rendered him or her unable to engage in substantial gainful activity. 42

4

U.S.C. § 423(d)(1)(A). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D.  ALJ Findings

Following the five-step sequential analysis, the ALJ found Plaintiff had not been under a disability from the alleged onset date of March 12, 2017, through the date of the decision, February 16, 2018. (R. 8 at PageID.61-62). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity during the relevant period. (*Id.* at PageID.54). Next, the ALJ determined Plaintiff had the following medically determinable, non-severe impairments: affective disorder; anxiety; alcohol addiction; personality disorder; lumbar degenerative disc disease; right elbow mild degenerative change; right elbow lipoma; right elbow lateral epicondylitis; carpal tunnel syndrome; gastroesophageal reflux disease; dizziness; and mild hearing loss. (*Id.*). The ALJ found that Plaintiff did not have a severe impairment or combination of impairments. (*Id.* at PageID.54-61). Thus, the ALJ did not craft an RFC for Plaintiff or proceed to steps four or five.

### E.  Administrative Record

#### 1.  Medical Evidence

In September 2011, Plaintiff saw Jamie Mulkey, a Family Nurse Practitioner, to establish a provider. (R. 8 at PageID.377). She complained of a bump on her right inner elbow, a foot rash, and sharp, intermittent pelvic pain. (*Id.*). Mulkey assessed her with hyperlipidemia, GERD, and a hematoma on her right elbow, and instructed her to increase her physical activity, follow a healthy diet, elevate her lower legs, and apply warm moist heat to the hematoma. (*Id.*). She also prescribed Mevacor and Zantac. (*Id.*). A bone density study came back normal. (*Id.* at PageID.384).

The next most recent records seem to be from 2014. Plaintiff saw Nurse Practitioner (NP) Rose Ross several times between April 2014 and May 2015. Relevant here, she complained of groin and low abdominal pain several times in April 2014. (*Id.* at PageID.353, 354, 356). And in May 2014, she presented with complaints of abdominal pain and low back pain, explaining she had fallen many years ago. (R. 8 at PageID.351). The NP noted she was tender across her upper abdomen and referred her for testing. (*Id.* at PageID.352). Because Plaintiff was struggling with alcohol abuse, they discussed strategies for Plaintiff to abstain from alcohol, but Plaintiff had "very little soc[ial] support" and no transportation to attend AA meetings. (*Id.* at PageID.351-352). On a health risk assessment Plaintiff completed the same day, she reported that she had exercised at least 20 minutes every day for the past week. (*Id.* at PageID.358). She had felt tense, anxious, or depressed almost every day for the past 30 days. (*Id.*).

About a year later, Plaintiff reported at her annual checkup that her anxiety and depression had been stable since the last visit and denied a depressed mood, any loss of interest or pleasure in activities, insomnia or excessive sleepiness, the inability to perform normal activities, a loss of energy, feelings of worthlessness or guilt, or trouble concentrating. (*Id.* at PageID.367). She had a normal mood and affect. (*Id.* at PageID.368). Her physical examination was normal except for tenderness in the epigastric region. (*Id.*). The NP assessed her with depression, onychomycosis, and low back pain, prescribed various medications—noting Plaintiff had not been adhering to her medication regimen— and recommended she take walks daily and work on decreasing her smoking and alcohol intake. (*Id.* at PageID.367-369). About a week later, a May 1, 2015 lumbar spine study showed "[m]ild exaggerated lumbar lordosis," but "[o]therwise, no acute abnormality in the lumbosacral spine," and "[m]inimal degenerative changes in the facet joints in the lumbar spine." (*Id.* at PageID.375).

Plaintiff made several visits to emergency rooms in 2015. In July, she reported with shortness of breath and pain in her left arm, chest, back and abdomen, which had started that morning. (*Id.* at PageID.443-444). She was hyperventilating. (*Id.* at PageID.444). Plaintiff explained that she had lost her husband a couple weeks prior and was under a lot of stress. (*Id.*). A physical examination was normal except that Plaintiff was anxious, and an EKG showed normal sinus rhythm with possible prior septal wall myocardial infarction of an undetermined age. (*Id.* at PageID.447, 448). The physician diagnosed the cause as anxiety and discharged Plaintiff in stable condition. (*Id.* at PageID.447).

The next month, Plaintiff visited the emergency room for anxiety, dizziness, back pain, and a mild headache. (*Id.* at PageID.459, 461). She reported that had "moments related to recent (1 month) death of husband." (*Id.* at PageID.461). She had smoking while sitting at a picnic, and when she stood up, she suddenly felt dizzy and off-balance. (*Id.*). A physical examination was normal, with normal range of motion on a musculoskeletal examination, and she had a normal mood and affect with normal behavior. (*Id.* at PageID.462-463). A CT scan of her head was normal. (*Id.* at PageID.470). The final diagnoses were dizziness and situational anxiety, and she was discharged in good condition. (*Id.* at PageID.459).

The next month, too, Plaintiff returned to the emergency room for a headache and anxiety. (*Id.* at PageID.473). Plaintiff had gone to see her doctor that day, but when she had been told she could not be seen due to an insurance issue, she had a panic attack. (*Id.* at PageID.477). She explained that the attacks had started after her husband died suddenly in July. (*Id.*). In addition to her headache, which Plaintiff rated as a 5 out of 10 on the pain scale, she complained of back pain, ear pain, myalgias, sinus pressure, and an upper respiratory tract infection. (*Id.* at PageID.475). She was "distressed (crying)," tearful, and anxious. (*Id.* at PageID.476, 477). Her speech, behavior, judgment, and cognition and memory were normal, although her mood was anxious and thought content paranoid. (*Id.* at PageID.477). About two hours after her arrival at the emergency room, she had rested for a while and her headache and anxiety had improved. (*Id.*) She had appointments scheduled with a doctor and a therapist. (*Id.*).

Later that month, September 2015, Plaintiff began seeing Stephanie Sethi at Monroe Community Mental Health Authority. (*Id.* at PageID.507). At the psychological evaluation with psychiatrist Kim Horn, Plaintiff reported "a lot of anxiety." (*Id.* at PageID.493). She explained she had been suffering from alcoholism "for a long time," which had worsened after she had to make the decision to "pull the plug" for her husband that summer. (*Id.*). She had since been getting Ativan from the emergency room on a regular basis. (*Id.*). Plaintiff complained of crying spells, dizziness, and blackouts, as well as memory and concentration issues. (*Id.*). And she reported "a long history of outburst[s] and aggressive behaviors." (*Id.* at PageID.504*)*. She slept six to eight hours a night, usually ate well, and had been losing weight. (*Id.* at PageID.493). Since August, she had been living at her mother's house, where she felt safe; she was close with her mother. (*Id.*). Horn observed Plaintiff to have an average appearance with normal speech rate, rhythm, and volume; good eye contact; normal kinetics; cooperative; euthymic affect; logical thought processes; congruent mood; poor to moderate insight; and intact judgment. (*Id.* at PageID.503-504). Horn noted that Plaintiff had suffered physical and sexual abuse throughout her childhood. (*Id.* at PageID.502). Further, Plaintiff said she had struggled with "attention deficit" during school. (*Id.*). She had had four children with her husband; all had been removed from her care before puberty and placed in foster care. (*Id.*).

Plaintiff was diagnosed with major depressive affective disorder recurrent episode severe degree without psychotic behavior; anxiety state unspecified; "acute alcoholic intoxication in alcoholism continuous drinking behavior"; nondependent cannabis abuse

unspecified use (early full remission); bereavement uncomplicated; and unspecified personality disorder. (*Id.* at PageID.495).

On October 20, 2015, Plaintiff visited Sethi for a medication refill. (*Id.* at PageID.493). She ranked her anxiety at 5 out of 10 and depression at 4 or 5. (*Id.*). She had occasional suicidal ideation but denied any intent to try suicide. (*Id.*). She had a lot of guilt over her husband's death and described paranoia and mood swings. (*Id.*). She had not had a drink in the past month. (*Id.*). Sethi adjusted her medications and asked her to follow up in a month. (*Id.*).

In November 2015, Plaintiff again visited Sethi for medication refill. (*Id.*). She had not had any alcohol for more than a month. (*Id.*). She rated her anxiety at a 4 out of 10. (*Id.*). She denied having a suicide plan but "wishes she wouldn't wake up." (*Id.*). Occasionally, she had "flashes of seeing her husband" and hearing him say negative things. (*Id.*). She got five or six hours of sleep a night; some nights she slept well, and others she tossed and turned. (*Id.*). Sethi noted continued improvement in her depression and anxiety, and adjusted her medications. (*Id.*).

Plaintiff returned to Sethi in December 2015. (*Id.* at PageID.514). She reported that thoughts of suicide came and went, but she was not going to act on them. (*Id.* at PageID.514). She complained of poor sleep. (*Id.*). Sethi considered her stable on current meds but added Vistaril for sleep and instructed Plaintiff to return in six weeks. (*Id.*).

In January 2016, Plaintiff reported to Sethi that she was still worrying excessively, but was now sleeping "a little better"—five to six hours a night, on average. (*Id.* at PageID.514). She had had six beers on New Year's. (*Id.*). She continued to have suicidal

10

ideation, but had no plan or intent to act on her thoughts. (*Id.*). She was "raging over the silliest things" and had thoughts of slapping her adult children. (*Id.*). She had not had any further hallucinations. (*Id.*). Sethi added trazodone to help Plaintiff sleep and instructed her to return in one month. (*Id.*).

In late September 2015, Plaintiff also visited Dr. H. George Levy, complaining of episodic dizziness for the past twenty years and hearing loss for the past 30 years, as well as pain in her left ear and ringing in both. (*Id.* at PageID.487). Things had worsened after her husband died in July. (*Id.*). A physical examination noted inflammation in her external ear canals; he assessed her with external otitis in both ears and prescribed Ciprodex. (*Id.* at PageID.488-489). A hearing test revealed bilateral mild sensorineural hearing loss with excellent speech discrimination ability. (*Id.* at PageID.490). When Plaintiff returned for a two-week checkup, she reported that the Ciprodex drops had helped, and Dr. Levy marked her external otitis as "resolving." (*Id.* at PageID.485).

Plaintiff saw Dr. Aamer Bhurgri about nine times between October 2015 and March 2016. (*Id.* at PageID.547-555). Unfortunately, Dr. Bhurgri's notes are all handwritten and somewhat difficult to decipher. In October 2015, Dr. Bhurgri referred Plaintiff for an MRI of her right elbow, which revealed an intramuscular lipoma in the distal brachialis muscle, mild degenerative changes, and mild common extensor tendinosis/later epicondylitis with a small intrasubstance partial-thickness tear. (*Id.* at PageID.538).

Dr. Bhurgri then referred her to Dr. Anthony Melonakos, whom she saw on November 13, 2015. (*Id.* at PageID.536). She complained of dull, intermittent elbow pain since 2013, currently rated at a 2 out of 10. (*Id.*). The pain did not keep her up at night or

prevent her from performing her daily activities. (*Id.*). She had experienced associated swelling, but no cracking, popping, locking, stiffness, weakness, numbness, redness, bruising, or fever. (*Id.*). In the area of the elbow, Dr. Melonakos observed a solid mass about six centimeters high and four centimeters wide. (*Id.*). Her right elbow was moderately swollen, with moderate tenderness on palpation. (*Id.* at PageID.537). The elbow had a normal range of motion and normal reflexes, carrying angle, grip strength, and sensation, with no crepitus, instability, subluxation, or laxity. (*Id.*). Carpal compression tests, Phalen's Sign, and Tinel's Sign were negative bilaterally. (*Id.*). Plaintiff's hands had normal grip strength and tone, but diminished sensation in the right middle and ring fingers. (*Id.*). Dr. Melonakos ordered an EMG because he was concerned "the mass may be pushing on the median nerve in the fossa." (*Id.*). The EMG was abnormal, with evidence of bilateral carpal tunnel syndrome, slightly worse on the right, and chronic right C5-C6 radiculopathy, neither of which involved ongoing denervation. (*Id.* at PageID.539).

Plaintiff saw Dr. Bhurgri again in November 2015, and he noted that on examination she had ear pain and "mild edema," but no focal deficit, normal strength, and a soft and nontender abdomen. (*Id.* at PageID.552).

When Plaintiff returned to Dr. Melonakos in January 2016 to receive her EMG results, he gave her a wrist brace, scheduled diagnostic tests and an ultrasound, and advised her to contact his office if the pain, swelling, or redness increased. (*Id.* at PageID.534-535). The ultrasound revealed a suspected lipoma; Dr. Melonakos noted that the mass seemed larger and firmer than before, and referred her to ortho oncology due to a concern it could be more than a benign lipoma. (*Id.* at PageID.533).

In late February 2016, Plaintiff visited Dr. Bhurgri with complaints of abdominal pain and occasional constipation. (*Id.* at PageID.549). A March 2016 CT for chronic abdominal pain revealed a 2.3 centimeter low-attention lesion in the midpole of the right kidney that did not have density consistent with a simple cyst; nonspecific nine-millimeter "hypoattenuating focus in segment 6 of the liver," of indeterminate clinical significance; and nonspecific wall thickening of the gastric fundus. (*Id.* at PageID.565-566). And March 9, 2016 imaging of Plaintiff's abdomen showed a presumed right renal cyst and small air-fluid levels in the left upper quadrant small bowel loops that could represent mild enteritis/ileus, but no obstruction and otherwise stable findings. (*Id.* at PageID.563-564). The imaging also showed a broad-based protrusion at L2-L3 with mild central canal stenosis. (*Id.*)

Lastly, on April 23, 2016, Dr. E. Montasir evaluated Plaintiff and completed an internal medicine report. (*Id.* at PageID.569). Plaintiff reported occasional headaches, without loss of consciousness, and mild bronchitis. (*Id.* at PageID.569-570). She denied hearing problems and abdominal pain. (*Id.* at PageID.570). She struggled with alcohol abuse and admitted to drinking a six-pack of beer daily and smoking one pack of cigarettes. (*Id.* at PageID.569). She had a long history of anxiety and depression, for which she took medication and followed with psychiatry on a monthly basis. (*Id.* at PageID.569). She also reported problems with learning, attention-deficit disorder, and Obsessive-Compulsive Disorder (OCD). (*Id.*).

The examiner found her to be in no acute distress, awake, alert, and oriented in person, place, and time. (*Id.* at PageID.570). Her abdomen was non-tender, with no

guarding or rebound, and no palpable masses, though she had tenderness in the left groin area. (*Id.*). Her gait and stance were normal, and she had a good handgrip, with no muscle atrophy. (*Id.*). Motor examination revealed fine muscle tone, and her sensory functions were intact to sharp and dull gross testing. (*Id.*). The examiner did note she had some limitation of the LS spine, possibly due to arthritic changes in the lumbar region. (*Id.*).

Plaintiff ambulated freely without aid, could tandem walk, got on and off the examination table without difficulty, and had no muscle weakness or atrophy. (*Id.*). She could sit, stand, bend, stoop, carry, push, pull, button clothes, tie shoes, dial a telephone, open a door, make a fist, pick up a coin or pencil, write, and climb stairs. (*Id.* at PageID.572). Her attempt at squatting was "almost complete with recovery." (*Id.* at PageID.570).

Dr. Montsair concluded that Plaintiff "should be able to work as far as her physical condition is concerned." (*Id.* at PageID.571). She would be limited in squatting or bending due to chronic back pain and arthritis, and should avoid climbing ropes, ladders, and scaffolding. (*Id.*). But "[m]anipulation with the hands, walking, standing, pushing and pulling should be without significant limitations." (*Id.* at PageID.571).

### 2.  Application Reports and Administrative Hearing

#### i.  Plaintiff's Function Report

Plaintiff completed a function report on September 29, 2015. (R. 8 at PageID.258-270). She explained that she was unable to work because she had anxiety disorder: "[W]hen I get stressed over something not being right or not perfect, I start to cry, lose my breath,

14

start to shake and lose my temper . . . and it's not pretty." (*Id.* at PageID.263). She also got dizzy and passed out "because of my ears and head." (*Id.*).

On an average day, Plaintiff woke up, went to the bathroom and got ready for the day, and then took her chihuahua outside. (*Id.* at PageID.264). Next, she got herself breakfast or her mother made it. (*Id.*). She passed the day making calls or going on walks, before returning home to eat dinner and go to bed at 10 PM. (*Id.*). She helped her mother by doing some house cleaning, yard work, laundry, and dishes. (*Id.*). Plaintiff took care of her chihuahua by herself, taking her outside, feeding her, and bathing her. (*Id.*). Before onset, she had been able to walk and exercise more, "have more fun," and drink. (*Id.*).

When it came to personal care, Plaintiff could shave by herself and feed herself, and she could get dressed, though she "hurt all over every morning." (*Id.*). She could also bathe herself, but when she got out of the shower or bathtub, she sometimes felt like she might fall. (*Id.*). Her arms hurt "a lot" when she did her hair. (*Id.*). And she sometimes needed help getting to the bathroom or back to her seat because she felt dizzy or like she might pass out. (*Id.*). At times she needed reminders about personal hygiene, and she would forget to take her medicine "at the right times or at all." (*Id.* at PageID.265). She sometimes could not sleep because she would "lay there and cry and worry about everybody in the world except me," such as her mother and children. (*Id.*).

Plaintiff prepared her own meals "every so often," such as sandwiches, soup, eggs, and toast, but it took her "too long" because she sometimes forgot simple steps. (*Id.* at PageID.265). She was trying to lose weight, so she was eating smaller portions and refraining from using salt or eating "junk." (*Id.*)

15

Around the house, Plaintiff was responsible for light cleaning, making the beds, sweeping, taking out "light trash," and sometimes raking leaves. (*Id.*). But it took longer than she thought it should; she had been told she was too slow and other people could do the same things faster. (*Id.*). She needed to be asked to do these things or "I don't do it until my mom drops the hint." (*Id.*).

Unless it was too cold, Plaintiff went out walking for four hours every morning. (*Id.* at PageID.266). She walked two hours to the store and two hours back, and usually bought something to drink such as water or coffee. (*Id.*). She also shopped for food, lottery tickets, clothes, music CDs, personal needs, and dog food. (*Id.*). But she was "afraid of different people all the time," and she was too afraid to drive. (*Id.*). Her insurance provided a transporter. (*Id.*). She was able to pay bills and use a checkbook or money orders, but not count change, because she could not focus well and often lost count. (*Id.*).

Her hobbies included watching TV, listening to music, talking with her mother, doing crossword puzzles, and talking to a few friends on the phone. (*Id.* at PageID.267). Sometimes, though, she had no interest in her hobbies. (*Id.*). And she did not spend much time around other people because she was distrustful and did not know anyone in the area. (*Id.*). She had trouble getting along with others, as she frequently became frustrated and upset and would yell "because things aren't the way I think they should be." (*Id.* at PageID.268). When in the presence of authority figures, she "always wants to run away and hide from them" because she "always feels like they are going to take me away or feel like someone thinks I did something wrong." (*Id.* at PageID.269).

16

Her impairments affected her abilities to lift, squat, bend, stand, reach, walk, kneel, talk, hear, climb stairs, see, complete tasks, concentrate, and follow instructions, as well as her memory and understanding. (*Id.* at PageID.268). She explained that she did not lift "heavy things" because of her back. (*Id.*). When walking or squatting she felt unstable and dizzy and would "almost pass out." (*Id.*). And when she talked she sometimes stuttered. (*Id.*). By Plaintiff's estimate, she could walk less than a mile before needing to stop and rest for a few minutes. (*Id.*). She could not pay attention for "long at all" before needing to take a break, and she did not finish what she started. (*Id.*). Neither written nor spoken instructions were easy for her to follow, as she often forgot what she had read or heard. (*Id.*).

Plaintiff did not handle changes in routine well—she would "get used to a certain way" and felt lost when things changed. (*Id.* at PageID.269). She was also plagued by fears: "I'm afraid of things and people and places and doing things that seem like I'm going to get hurt or scared to death." (*Id.*).

Plaintiff wore glasses when reading or watching TV. (*Id.*). She took medications, but none caused any side effects. (*Id.* at PageID.270).

### ii.   Third-Party Function Report

Plaintiff's mother, Daisy Walter, completed a third-party function report on October 1, 2015. (R. 8 at PageID.271-281). She spent entire days together with Plaintiff. (*Id.*). She explained that Plaintiff could not work because she had anger problems and anxiety disorder, she yelled a lot, and she was "slow at doing things." (*Id.* at PageID.274). Plaintiff spent her time listening to the radio, walking, and talking with her mother. (*Id.* at

17

PageID.275). Since onset, she now got out of breath more quickly when walking. (*Id.*). Plaintiff's mother did not believe her impairments affected her sleep, and had observed no issues with her personal care, except that she sometimes needed reminders about grooming or taking medicine. (*Id.* at PageID.276).

Around the house, Plaintiff helped her mother and took care of her dogs by walking them and bathing them. (*Id.* at PageID.275). Although she needed reminders, she could do the laundry and the dishes, which took her one hour. (*Id.* at PageID.276). Sometimes she helped prepare meals, but she was slow (taking a half hour or more) and sometimes did not want to help. (*Id.*).

Her mother corroborated that Plaintiff went out every day. (*Id.* at PageID.277). Once a week she spent about an hour and a half shopping in stores for food, clothes, and personal items, though she became nervous around groups of people. (*Id.* at PageID.277, 278). She was able to pay bills, count change, and use a checkbook or money orders. (*Id.* at PageID.277).

For fun, Plaintiff watched TV, read, listened to the radio, and visited garage sales. (*Id.* at PageID.278). Her mother had not noticed any change in her hobbies since onset. (*Id.*). She had no trouble getting along with other people, but got very nervous around authority figures. (*Id.* at PageID.279, 280).

Plaintiff's OCD and Attention Deficit Disorder (ADD) affected her abilities to lift, squat, bend, stand, reach, walk, sit, kneel, talk, hear, climb stairs, see, complete tasks, follow instructions, and use her hands, as well as her memory, concentration, and understanding—all the abilities listed on the form except "getting along with others." (*Id.*).

18

By her mother's estimate, she could walk three-quarters of a mile before needing to rest for 10 minutes. (*Id.*). She did not follow written or spoken instructions well, did not finish what she started, and could not pay attention for long. (*Id.*).

Her Celexa caused mood swings as a side effect, and her Buspirone caused dizziness and drowsiness. (*Id.* at PageID.281).

### 3. The Administrative Hearing

An administrative hearing was held in Plaintiff's case on October 11, 2017. (R. 8 at PageID.67-87). At the outset, Plaintiff amended her alleged onset date to March 12, 2017, when she turned 55 years old. (R. 8 at PageID.70-71).

Plaintiff lived with her mother. (*Id.* at PageID.73). She had never had a driver's license. (*Id.* at PageID.74). She had finished 11th grade and joined the military, but had been sent home after two months. (*Id.*). As far as Plaintiff could remember, she had last worked in 2003, for McDonald's, for about two years, but she struggled to remember the details and at first confused it with a different job. (*Id.* at PageID.74-75). She had been fired from McDonald's because she "couldn't keep getting there on time" due to a lack of transportation. (*Id.* at PageID.76). Prior to that, she had worked for a couple months at Los Seres Resort. (*Id.* at PageID.76-77).

Since leaving McDonald's, Plaintiff had not worked due to her lack of transportation and her health issues, including back arthritis and arm pain. (*Id.* at PageID.77). She could not stand for long before her legs, knees, and back began bothering her. (*Id.* at PageID.77-78). She had been seeing Dr. Bhurgri for her back pain for about two years, and he had told her to take Tylenol. (*Id.* at PageID.78).

19

The ALJ inquired what health problems had kept her from working in 2003, if she had only begun seeking treatment for her back pain two years ago. (*Id.* at PageID.79). She admitted in 2003 the issue was "[j]ust mainly not having transportation," although "a long time ago" she had hurt her back "falling on a bed frame, you know the old couch pullout beds." (*Id.* at PageID.78-79). Her knees had also started to bother her in the last couple of months. (*Id.* at PageID.79).

By Plaintiff's estimate, she could walk two miles, but standing in one place for a long time—"[a]n hour or two would be too much"—hurt her legs. (*Id.* at PageID.83). She had no problems sitting. (*Id.* at PageID.83-84). Her arms hurt "in the muscle areas between the elbow and the shoulders," worse in her (dominant) right arm. (*Id.* at PageID.82-83). Her arm issues limited her to lifting less than 20 pounds. (*Id.* at PageID.83).

Plaintiff had also struggled with depression and anxiety, especially after her husband died in 2015. (*Id.* at PageID.80). She had trouble concentrating or focusing, and had always had poor short-term memory. (*Id.*). Because of her anxiety, she thought she was "not good enough" and suspected people were judging her "all the time," so she did not spend time with others often. (*Id.* at PageID.81). She also had trouble handling stress. (*Id.*). Although she was taking medication for her mental health issues and felt she had improved since her husband's death, she and her doctors were still adjusting her medications. (*Id.* at PageID.81). In addition, she had been abusing alcohol around the time her husband died, but she testified that was no longer an issue. (*Id.* at PageID.82).

Lastly, Plaintiff mentioned that she had visited a gastroenterologist for an ulcer in her stomach "that's causing really discomfort." (*Id.* at PageID.84).

Although a VE was present at the hearing, the ALJ did not ask him any questions, but concluded that "[b]ased upon her testimony, there is no past work and therefore, it would appear that she grids under 203.10, with the amendment of the AOD to her 55th birthday. So we don't need testimony from [the VE] and that concludes the hearing." (*Id.* at PageID.86).

### F.  Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into categories: "acceptable medical sources" and "other sources." 20 C.F.R. §§ 404.1513 (amended March 27, 2017), 416.913 (amended March 27, 2017).[2] "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* §§ 404.1513(a), 416.913(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* §§ 404.1513(d), 416.913(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006). Both acceptable and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* When acceptable medical sources

---

[2] SSR 06-03p was rescinded effective March 27, 2017, and 20 C.F.R. § 404.1513 was updated as of March 27, 2017. The new regulation is effective for cases filed on or after March 27, 2017; because Plaintiff filed for benefits in September 2015, (R. 8 at PageID.221-229), I consider her case under the old rule.

issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. §§ 404.1527 (eff. Sept. 3, 2013 to Mar. 26, 2017), 416.927 (eff. Aug. 24, 2012 to Mar. 26, 2017). Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. *Id.* §§ 404.1527(d), 416.927(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. *Id.* §§ 404.1527(c) (eff. Sept. 3, 2013 to Mar. 26, 2017), 416.927(c) (eff. Aug. 24, 2012 to Mar. 26, 2017). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. §§ 404.1527(c), 416.927(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

Because Plaintiff filed her claim before March 27, 2017, she is entitled to the benefit of the treating-source rule. Under that rule, certain opinions of a treating physician receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature

22

and severity of the claimant's impairments. 20 C.F.R. §§ 404.1527(d), 416.927(c)(2). Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. §§ 404.1527(d), 416.927(d).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to a treating source's opinion in the written determination. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits must give specific reasons, supported by record evidence, for the weight granted to a treating source's opinion. *Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec'y of Health & Human Servs.*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273 (Table), 1995 WL 138930, at *1 (6th Cir. 1995).

The claimant must provide evidence establishing his or her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A); *see also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most he [or she] can still do despite his [or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2).

In accordance with SSR 16-3p, an ALJ must analyze the consistency of the claimant's statements with the other record evidence, considering his or her testimony about pain or other symptoms with the rest of the relevant evidence in the record and factors

outlined in the Social Security Ruling. SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016). This analysis and the conclusions drawn from it—formerly termed a credibility determination[3]—can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 981 (6th Cir. 2011); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529(a) (2016); SSR. 96-7p, 1996 WL 374186, at *2 (July 2, 1996). The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529 (2016); SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996); *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996).

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quoting *Green v. Schweiker*,

---

[3] Although the Commissioner has rescinded SSR 96-7p and eliminated the term "credibility" from Administration policy, SSR 16-3p, 2016 WL 1119029, at *1 (Mar. 16, 2016), the underlying regulation has remained materially unchanged, *see* 20. C.F.R. § 404.1529(c), and I agree with the courts in this District that have continued to apply SSR 96-7p to cases arising prior to its rescission. *See, e.g.*, *Cooper v. Comm'r of Soc. Sec.*, No. 16-cv-13477, 2017 WL 3923984, at *3 (E.D. Mich. August 21, 2017), *Rep. & Rec. adopted by* 2017 WL 3891971 (E.D. Mich. Sept. 9, 2017); *Tuttle v. Comm'r of Soc. Sec.*, No. 16-11144, 2017 WL 2928021, at *6 n. 3 (E.D. Mich. June 9, 2017), *Rep. & Rec. adopted by* 2017 WL 2905125 (E.D. Mich. July 7, 2017).

749 F.2d 1066, 1071) (3d Cir. 1984)) (internal quotation marks omitted), a claimant's description of his or her physical or mental impairments will "not alone establish that [he or she is] disabled." 20 C.F.R. § 404.1529(a). The absence of objective, confirming evidence obligates the ALJ to consider the following factors:

> (i)     [D]aily activities;
> (ii)    The location, duration, frequency, and intensity of . . . pain;
> (iii)   Precipitating and aggravating factors;
> (iv)    The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;
> (v)     Treatment, other than medication, . . . received for relief of . . . pain;
> (vi)    Any measure . . . used to relieve . . . pain.

20 C.F.R. § 404.1529(c)(3), 416.929(c)(3) (2016); *see also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994); SSR 96-7p, 1996 WL 374186, at *5 (July 2, 1996).

### G. Analysis

Plaintiff argues the ALJ's decision cannot stand because the ALJ failed to properly consider the medical opinions of the non-examining state agency medical consultant and non-examining state agency psychologist, both of whom found that Plaintiff had severe impairments. (R. 10 at PageID.588). This error prejudiced Plaintiff, she says, because if she had been found to have *any* severe impairments, a finding of disability would have been directed due to her age, education, and work experience. (R. 10 at PageID.590).

Social Security Ruling 96-6p emphasizes that "[f]indings of fact made by State agency medical and psychological consultants . . . regarding the nature and severity of an individual's impairment(s) must be treated as expert opinion evidence of nonexamining

sources" at the ALJ level. SSR 96-6p, 1996 WL 374180, at *1 (S.S.A. July 2, 1996).[4] ALJs "may not ignore these opinions and must explain the weight given to these opinions on their decisions." *Id*.

Here, the non-examining state agency medical consultant, Eric VanderHaagen, DO, found Plaintiff to have several severe impairments: Personality Disorders; Alcohol, Substance Addiction Disorders; Anxiety Disorders; Affective Disorders; and Other Disorders of Gastrointestinal System. (R. 8 at PageID.115). She also had non-severe impairments of DDD (Disorders of Back-Discogenic and Degenerative), Hearing Loss Not Treated with Cochlear Implantation, and Carpal Tunnel Syndrome. (*Id.*).

VanderHaagen opined Plaintiff would be subject to external, postural, and environmental limitations. (*Id.* at PageID.118-119). He estimated she could occasionally lift 50 pounds, frequently lift or carry 25 pounds, stand or walk for six hours in an eight-hour day, and sit six hours in an eight-hour day, with unlimited pushing or pulling. (*Id.* at PageID.118). This took into account Plaintiff's lumbar degenerative disorder with back pain, as well as her normal gait and lack of sensory, motor, or reflex deficits. (*Id.*). As for postural limitations, she could frequently climb ramps or stairs, balance, stoop, kneel, crouch, or crawl, and occasionally climb ladders, ropes, or scaffolds. (*Id.* at 118-119). And she should avoid concentrated exposure to noise because with her mild sensorineural hearing loss, she "would likely find excessive noise confusing." (*Id.* 119).

---

[4] SSR 96-6p was rescinded and replaced by SSR 17-2p effective March 27, 2017; I refer to SSR 96-6p because it was still in effect at the time Plaintiff filed her benefits claim.

The non-examining state agency psychological consultant, Ron Marshall, Ph.D., found Plaintiff had mild restrictions in her activities of daily living and mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no repeated episodes of decompensation. (*Id.* at PageID.116) She was moderately limited in the ability to understand and remember detailed instructions, but had no limitations on sustained concentration and persistence or social interaction (*Id.* at PageID.120). He expected she would be moderately limited in her ability to respond appropriately to changes in the work setting, as during her activities of daily living, she became "frustrated and upset when things don't go the way they should." (*Id.* at PageID.121). In conclusion, he said, Plaintiff retained the ability to do rote tasks, follow and retain simple instructions, and work with others. (*Id.*). But she might have difficulty retaining complex instructions and might work best in a low demand work environment. (*Id.*).

The ALJ does not mention VanderHaagen anywhere in his decision, (*id.* at PageID.51-62), though the List of Exhibits indicates the opinion was before him, (*id.* at PageID.63). As for the non-examining state agency psychologist, Dr. Marshall, the ALJ does mention his opinion: "Dr. Marshall reviewed the claim at the initial level and opined that the claimant was able to follow and retain simple instructions, although she might have difficulty retaining complex instructions, and she would work best in a low demand work environment." (R. 8 at PageID.61). But the ALJ's analysis ends there. He never assigns any weight to Dr. Marshall's opinion or explains to what extent he credited it.

Defendant does not contest that either of these apparent oversights was error. The question, then, is whether the errors were harmless. It is true that federal agencies are bound to follow their own regulations. *See Wilson*, 378 F.3d at 545 (citing *Sameena, Inc. v. United States Air Force*, 147 F.3d 1148, 1153 (9th Cir. 1998)). But not every procedural error necessitates remand. "[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless 'the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) (citing *Connor v. United States Civil Serv. Comm'n*, 721 F.2d 1054, 1056 (6th Cir. 1983)). I note that "the burden of showing that an error is harmful normally falls upon the party attacking the agency's determination," *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009).

Plaintiff essentially suggests the error harmed her because if the ALJ had credited the consultants and found she had a severe impairment at step two, the ALJ would have proceeded to step three, at which point he would consider whether Plaintiff had an impairment or combination of impairments that met or equaled a listing. The listings direct a finding of "disabled" for a claimant of Plaintiff's age, education level, and work experience. 20 C.F.R. Part 404, Subpart P, Appendix 2, 203.10 (directing a finding of disability for a claimant of (1) advanced age, with (2) limited or less education, and (3) no previous work experience). *See also* Program Operations Manual System (POMS), DI 25010.001 Special Medical-Vocational Profiles (B)(2) (directing a finding of "disabled" for a claimant who (1) has a severe impairment; (2) has no past relevant work; (3) is age 55 or older; and (4) has no more than a limited education). Defendant does not dispute that

the regulations would direct a finding of disability if Plaintiff had *any* severe impairment. Defendant argues, however, that remand is unwarranted because the ALJ's errors were harmless, for reasons discussed in more detail below.

I suggest the ALJ's errors here prejudiced Plaintiff on the merits. If the ALJ were to credit the non-examining state agency consultants to the extent that he found Plaintiff to have even *one* severe impairment, she would be entitled to benefits. Thus, I cannot say the error was harmless, I suggest Plaintiff has been prejudiced, and I recommend the court remand this case so the ALJ can properly consider the opinions of the two consultants. This result is consistent with other district courts in the circuit that have confronted similar issues. *Whitlock v. Berryhill*, NO. 3:17-CV-00714, 2018 WL 4775505, *4-5 (W.D. Ky. Oct. 3, 2018) (finding reversible error where ALJ ignored opinions of non-examining state psychiatrist and psychologist); *Molebash v. Comm'r*, No. 2:16-cv-869, 2017 WL 3473816 (S.D. Ohio Aug. 14, 2017) (finding reversible error when the ALJ ignored the opinions of the Commissioner's own nonexamining physicians), *rep. & rec. adopted in* 2017 WL 3769353 (S.D. Ohio Aug. 29, 2017); *Johnson v. Astrue*, No. 1:09 CV 2959, 2010 WL 5559542, at *6 (N.D. Ohio Dec. 3, 2010) (finding claimant was prejudiced on the merits and remand was appropriate because the ALJ's RFC was inconsistent with the opinions of two nonexamining state psychologists, and the ALJ ignored those opinions and failed to articulate the weight proscribed to them), *rep. & rec. adopted in* 2010 WL 5478604 (N.D. Ohio Dec. 30, 2010). For all the above reasons, I suggest the court remand this case under sentence four of 42 U.S.C. § 405(g).

Before closing, however, I will address Defendant's arguments that the error was harmless. First, Defendant asserts the error was harmless because Plaintiff fails to explicitly argue that the ALJ's step two finding was not supported by substantial evidence, and fails to present worthwhile substantial evidence in her favor; Defendant dismisses the opinions of the consultants because both were rendered prior to Plaintiff's alleged onset date. (R. 11 at PageID.600). Second, Defendant says, the ALJ need only credit a state agency opinion if it is consistent with the other evidence in the record, and that was "impossible" here because there was no medical evidence from after her alleged onset date. (*Id.* at PageID.601). Third, "it is clear from the ALJ's discussion of the evidence why he did not credit the state agency consultants' assessments," because the evidence supports the ALJ's finding that Plaintiff's physical impairments were not severe. (*Id.* at PageID.601-607).

Defendant presents several pages of evidence supporting the ALJ's findings to show that Plaintiff failed to undermine the substantial evidence supporting the ALJ's step two finding. (R. 11 at PageID.601-607). This argument is unavailing, however, because even if a decision is supported by substantial evidence, it "will not be upheld where the SSA [Social Security Administration] fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007); *see also Rabbers*, 582 F.3d at 651; *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004). The question, then, is really whether the ALJ's oversights here prejudiced Plaintiff on the merits or deprived her of a substantial right—and I suggest Plaintiff was prejudiced, as explained above.

30

Additionally, I find unconvincing Defendant's concerns that the consultants penned their opinions prior to Plaintiff's amended alleged onset date. Defendant takes the position that an ALJ need not credit a state agency opinion when it is not consistent with other evidence in the record *from after the alleged onset date*—of which this case has none. For this proposition, Defendant cites 20 C.F.R. § 416.927(c)(4)[5], which says only that consistency is one consideration in determining the weight to give a medical opinion, and that "[g]enerally, the more consistent a medical opinion is with the record as a whole, the more weight we will give to that medical opinion." More on point is SSR 96-6p, which clarifies that "the opinions of State agency medical and psychological consultants . . . can be given weight only insofar as they are supported by evidence in the case record." SSR 96-6p, 1996 WL 374180, at *2 (S.S.A. July 2, 1996). The ALJ is to consider "such factors as the supportability of the opinion in the evidence . . . , the consistency of the opinion with the record as a whole, including other medical opinions, and any explanation for the opinion provided by the State agency medical or psychological consultant or other program physician or psychologist." *Id.* Both the regulation and the ruling, however, say quite plainly the ALJ is to judge the opinion's consistency "with the record as a whole." Neither requires that the ALJ judge the opinion's consistency *only* with evidence from between the alleged onset date and the date of the decision. Defendant's reading defies the plain meaning of the text, and I cannot credit it.

---

[5] This regulation remains in effect for claims filed before March 27, 2017. 20 C.F.R. §§ 416.920c, 416.927.

Relatedly, Defendant argues that Plaintiff has failed to show prejudicial error because the evidence she relies upon—the consultants' opinions—predates her amended alleged onset date. I find this argument equally unpersuasive. Defendant drops a citation to *Moore v. Colvin*, No. 14-12310, 2015 WL 4066735 (E.D. Mich. July 2, 2015), which asserts that "[t]his Court has repeatedly stated that an ALJ is limited to considering medical evidence rendered after the alleged onset date." In support of this proposition, *Moore* cites only two cases: *Gatewood v. Astrue*, No. CIV. 0713326, 2008 WL 3838354, at *14 (E.D. Mich. Aug. 12, 2008), and *Mohssen v. Comm'r of Soc. Sec.*, No. 12-14501, 2013 WL 6094728, at *11 (E.D. Mich. Nov. 20, 2013).

*Gatewood* itself offers no authority or explanation whatsoever for the lone sentence: "The ALJ was limited to considering the evidence during the relevant period only." *Gatewood*, 2008 WL 3838354, at *14. Closer inspection of *Gatewood* illuminates the reason for this dearth of analysis: the court was not making a statement about the law, but rather a reference to the particular remand order from the Appeals Council in that case, which had "specifically instructed the ALJ to consider the time period before June 1, 2001." *Id.* at *6, *14. No such order restricts the ALJ in this case.

That leaves *Moore* swaying on a single leg: *Mohssen*, which does not actually assert that ALJs are limited to considering evidence after the alleged onset date. Rather, it states that "[c]ourts have held that an ALJ's failure to mention a treating physician's opinion, which was based on the claimant's condition before the alleged onset date, is harmless error." *Mohseen*, 2013 WL 6094728, at *11 (citing *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001)). While this may initially sound quite promising for

32

Defendant, it is based in an oversimplified summary of *Heston*, a case that is in fact easily distinguishable. *Heston* did find harmless the ALJ's failure to mention a treating physician's opinion that was based on the claimant's condition before the alleged onset date. *Heston*, 245 F.3d at 535. But in *Heston*, the ALJ's oversight was rendered harmless in part because the ALJ had—"wittingly or not," as *Wilson* puts it—crafted an RFC that was consistent with the very limitations proposed by the slighted physician. *Wilson*, 378 F.3d at 547-48; *Heston*, 245 F.3d at 536. The same cannot be said here.

Further, district courts in this circuit have recognized that medical evidence predating the alleged onset date can sometimes be probative of disability during the relevant period, particularly "where evidence before or after the relevant period shows findings indicative of an ongoing or chronic impairment that does not improve or fluctuate." *Hill v. Comm'r of Soc. Sec.*, No. 17-10089, 2018 WL 1404416, at *8 (E.D. Mich. Feb. 27, 2018). *See, e.g.*, *Dimizio v. Berryhill*, No. 2:16-cv-6, 2017 WL 4078948, at *3-4 (E.D. Tenn. Sept. 13, 2017); *O'Malley v. Comm'r of Soc. Sec.*, 210 F. Supp. 3d 909, 915 (S.D. Ohio 2016); *Daniel v. Colvin*, No. 1:14-CV-775, 2015 WL 55302, at *3-4 (S.D. Ohio Sept. 21, 2015). *See also Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10th Cir. 2008) (holding that the ALJ is required to consider all evidence—including evidence predating an alleged onset date—based at least in part on 20 C.F.R. § 416.920(a)(3)'s mandate that the ALJ "consider all evidence in [the] case record"). I therefore suggest the court decline to find the ALJ's error harmless simply because the consultants' opinions were dated prior to the claimant's alleged onset date.

One matter remains. In Plaintiff's reply, she points to an October 3, 2017 letter from Plaintiff's representative (who also represents her in this case) to the Social Security Administration in which he explained that he was still awaiting medical records spanning from 2016 to the present. (R. 8 at PageID.326). He requested that the ALJ hold the record open for that evidence. (*Id.*). The matter was not discussed at Plaintiff's hearing—at least not on the record. When the ALJ issued his decision on February 16, 2018, about four months after the October letter, no additional records had been submitted and Plaintiff's representative had not requested any additional time. (*Id.* at PageID.51).

It is unclear what exactly Plaintiff seeks to gain by recounting these facts. She does not explicitly allege a claim of error or seek remand on this ground, though she at least implies that the ALJ erred by not affirmatively stating he would hold the record open for the evidence described in Plaintiff's letter. Plaintiff also emphasizes the ALJ's statement at the hearing that "it would appear that she grids under 203.10," perhaps to imply that Plaintiff's representative was thereby lulled into a false sense of security and so did not concern himself with submitting the promised records. (R. 12 at PageID.612). Defendant, meanwhile, interprets Plaintiff's brief as "raising the argument that the ALJ failed in his duty to develop the record." (R. 14 at PageID.619). It does not much matter exactly what new argument Plaintiff intended to make with these facts, however, as the Sixth Circuit "has consistently held that arguments not raised in a party's opening brief . . . are waived." *See Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 624 (6th Cir. 2013). I therefore suggest that Plaintiff has waived this argument. The regulations provide for additional evidence to be taken on remand, as may be appropriate here. *See* 20 C.F.R. §§ 416.1483, 1477.

34

### H. Conclusion

For the reasons explained above, I **RECOMMEND** that Plaintiff's Motion for Summary Judgment, (R. 10), be **GRANTED**, the Commissioner's Motion for Summary Judgment, (R. 11), be **DENIED**, and this case be **REVERSED AND REMANDED** under sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this report.

## III.   REVIEW

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file

35

a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  June 19, 2019                           S/ PATRICIA T. MORRIS
                                               Patricia T. Morris
                                               United States Magistrate Judge


## CERTIFICATION

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: June 19, 2019                            By s/Kristen Castaneda
                                               Case Manager